IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 11, 2021

**STATE OF TENNESSEE v. CASSIUS DOMINIQUE IVORY**

**Appeal from the Circuit Court for Rutherford County**
**No. 81766-A    David M. Bragg, Judge**

_____

**No. M2020-01458-CCA-R3-CD**
_____

The defendant, Cassius Dominique Ivory, appeals his Rutherford County Circuit Court jury convictions of first degree murder and especially aggravated robbery, arguing that the State failed to disclose a preferential agreement with a witness, that the State failed to produce certain pretrial statements, that the trial court failed to merge certain offenses, and that the evidence was insufficient to support his convictions. Because the record establishes that the State did not fail to disclose a preferential agreement or pretrial statements, the trial court properly merged the offenses, and the evidence was sufficient to support the convictions, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Amanda J. Gentry (at trial and on appeal) and Timothy Wehby (at trial), Nashville, Tennessee, for the appellant, Cassius Dominique Ivory.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Matthew Westmoreland and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Rutherford County Grand Jury charged the defendant with one count of especially aggravated robbery, one count of first degree premeditated murder, and an alternative count of first degree felony murder.[1]

_____

[1]    The indictment also charged Ardie S. Bradley with especially aggravated robbery, first degree felony murder, and tampering with evidence; Martavous Dejuan Broadnax with tampering with evidence

At the October 2019 jury trial, Murfreesboro Police Department ("MPD") Sergeant Ricky Haley, who worked as a patrol officer in March 2016, testified that he responded to a report of 10 to 12 shots fired at the Vie Apartments "just before 5:00 a.m." on March 18, 2016. He found a deceased male victim, later identified as Donte Johnson, lying in the parking lot with "numerous bullet wounds on his body."

Doctor Emily Dennison, who performed the victim's autopsy, testified as an expert in forensic pathology. She determined the victim's cause of death to be "[m]ultiple gunshot wounds" and his manner of death to be homicide. She found at least eight gunshot wounds on the victim's body, most of which entered his body traveling "from back to front, left to right, and upward" causing injuries to the victim's intestines, stomach, lungs, heart, and liver, among other things. On the left side of the victim's head, Doctor Dennison found a laceration—"a large or a deep tear in the skin that happens either when a body hits a blunt object like the ground or a blunt object hits the body"—that was inflicted "around the time of death." The victim also had "a subgaleal hematoma or like a bruise basically to the scalp and then to the muscle underneath that as well."

During cross-examination, Doctor Dennison testified that the victim had abrasions, or scratches, on his face that had been sustained within a day before his death, but she could not determine a more specific timeframe. She described the bullets recovered from the victim as "large caliber projectiles."

The victim's mother, Erika Kelley, testified that the 23-year-old victim, who went by the nickname "Y.P.," had been living with her in Memphis "off and on." On March 10, 2016, the victim traveled to Murfreesboro to visit a friend. Ms. Kelley said that the victim purchased a pair of red sneakers for over $300 a few weeks prior to his death.

MPD Detective Ed Gorham processed the crime scene. When he arrived at the Vie Apartments on March 18, he "noticed the victim was lying between a truck and a car in the parking lot. And there were numerous shell casings laying on the ground around him." Detective Gorham noted that it appeared that the victim had been shot while lying on the ground because he saw what "looked like ricochets in the pavement on the parking lot." Officers collected nine .40 caliber shell casings from around the scene, including one .40 caliber bullet from "the breezeway on the second floor in front of apartment 3324," and six bullet fragments. On March 19, officers recovered three additional shell casings "[f]rom the blue truck that was parked next to the victim" and found blood stains "on the

and filing a false report; and Christopher Deundre McLilly with initiating a false report and accessory after the fact. The record does not indicate whether the court granted severance or whether the co-defendants resolved their cases before trial, but the defendant was tried alone.

rim of the truck."

Brandon Herman, who was charged as a co-defendant in this case,[2] testified that he traveled from his home in Chattanooga to Murfreesboro in March 2016 for "a few days" to watch a state high school basketball tournament. On March 17, Mr. Herman went to the apartment of Ardie Bradley, whom he had known since childhood, "[j]ust to hang out." Mr. Bradley lived at the Vie Apartments with Mr. Bradley's girlfriend, a roommate known as "Ski," who was later identified as Martavous Broadnax, and Mr. Broadnax's girlfriend. That night, Mr. Bradley went "to a party" in an upstairs apartment, and around midnight, Mr. Herman and Mr. Broadnax joined him. Mr. Herman estimated that 20 to 30 people were at the party, where "everybody [wa]s just chilling, having drinks, listening to music." Mr. Herman stayed at the party for approximately one hour and left because "[t]hey were gambling, and I didn't know nobody." Mr. Herman returned to Mr. Bradley's downstairs apartment and went to sleep in Mr. Bradley's bedroom.

Mr. Herman awoke to "[b]anging at the door" of the apartment. When he came out of the bedroom, he saw Mr. Broadnax and the victim, whom Mr. Herman did not know, and realized that the victim had locked the apartment door, and Mr. Bradley was banging to be let in. Mr. Bradley and the victim argued. Mr. Bradley "wonder[ed] why the victim was in his house with his door locked. And the victim was trying to tell [Mr. Bradley] that he was looking for something -- something that was stolen from him." Mr. Herman later determined that the victim was looking for a gun that he said had been "taken from him." Mr. Herman said that Mr. Bradley discovered that a bag of marijuana was missing from his bedroom, and Mr. Bradley called the defendant "to come downstairs and make sure [the victim] don't leave while he look[ed]" for it. When the defendant arrived, it was "just a big argument." The men continued to argue about the missing items, and the victim continued to "pretend[] as if he didn't take anything." The defendant began "kind of like pushing on him, threatening him a little bit" and "telling him like he's going to beat him up if he find the stuff." The defendant took a gun from his pocket and threatened the victim, telling him that "he was going to shoot him."

The defendant and Mr. Bradley went outside where they found the bag of marijuana, and, when they came back in, they "jump[ed] on" the victim and "start[ed] beating him up." The victim "tried to fight back," but the men "kind of pushed him into the corner." At some point during the fight, Mr. Herman attempted to intervene "[b]ecause I didn't want the police being called." Although other people were in Mr. Bradley's apartment during the fight, Mr. Herman said that he did not know anyone except for Mr. Bradley and Mr. Broadnax and that he assumed the other people to be friends of the defendant's. The defendant "pulled the gun and made [the victim] take off his shoes," after

---

[2]     Mr. Herman was charged by a separate indictment.

which, the victim was forced outside, and the defendant, with "the gun in his hand," was "just waving him outside, like telling him to leave." The victim began "backing up" with "his hands in the air" until he reached the parking lot. When the victim tried to run, the defendant "started shooting." Mr. Herman heard multiple gunshots in rapid succession. He said that the victim fell "[i]n between the cars" and that the defendant "kept shooting him." Mr. Herman left at that point. He was later stopped by police who told him that witnesses had reported seeing his vehicle driving away from the scene. During the traffic stop, Mr. Herman realized that he had been shot in his lower left leg, and the police transported him to the hospital before questioning him. Mr. Herman acknowledged that he initially told the police officers that he had not seen the incident because he "didn't want to be involved in it." He also acknowledged that he did not want to be at the defendant's trial but denied that the State made any promises to him in exchange for his testimony.

During cross-examination, Mr. Herman reiterated that the State had not made him any promises of leniency for his testimony. He said that he had been friends with Mr. Bradley since elementary school and that Mr. Bradley was the only person that he knew at the Vie Apartments before this incident. Mr. Bradley invited Mr. Herman to his apartment, and Mr. Herman did not know about the party before he arrived. Mr. Herman said that he did not see any firearms at Mr. Bradley's apartment but that he saw several people with firearms at the party. In the upstairs apartment, Mr. Bradley saw five or six people in a bedroom playing a dice game. Mr. Herman said that when he went back to Mr. Bradley's apartment to sleep, he saw some plastic bags of marijuana on the floor of Mr. Bradley's bedroom and that when he awoke approximately one hour later, the bags were gone. Mr. Bradley accused the victim of taking the drugs, and, after Mr. Bradley called the defendant for help, the defendant and at least 10 other people came inside the apartment. Mr. Herman said that the victim was mad about the dice game's being robbed, and Mr. Herman believed that the victim's gun had been stolen during that robbery. He estimated that the group argued for an hour, during which time he saw several people with small firearms. He said that the victim did not have a gun. After Mr. Bradley and the defendant found the marijuana outside, Mr. Herman assumed that the victim had taken the marijuana and hidden it outside. When Mr. Bradley and the defendant returned with the recovered marijuana, the argument "got physical," and the victim was assaulted. Mr. Herman described the victim's shoes as expensive, "red Balenciagas."

On redirect examination, Mr. Herman acknowledged that he had been indicted in this case based on text messages in which he had implicated himself by saying, "We beat him up. He's dead." He explained that his use of "we" was intended only to indicate sides in the argument and not his participation in the assault. He said that the defendant was the person who shot the victim.

MPD Detective Jacob Fountain testified that he arrived to the scene at

-4-

approximately 6:00 a.m. He and another detective canvassed the neighborhood, hoping to talk to potential witnesses. At apartment 3213, a ground level apartment, a woman answered the door, and the detective "could immediately detect the odor of marijuana coming from the residence." After he told the woman "that we had the right to come in to secure the apartment because of the odor of marijuana," the woman allowed the officers entry. The woman appeared "kind of distant and reluctant to talk to me," and when Detective Fountain asked her if anyone else was there, "she kind of hesitated and kind of stuttered." She eventually told him that her boyfriend was there. Because the boyfriend did not come out to the common area of the apartment, Detective Fountain "decide[d] to secure the apartment" and entered the woman's bedroom. He found a man, later identified as Mr. Bradley, "standing in the shower behind a shower curtain." Mr. Bradley denied that he had been present during the shooting, and the woman confirmed that Mr. Bradley did not arrive home until 6:00 a.m. Another man, later identified as Mr. Broadnax, came out of another bedroom while Detective Fountain was there. Later that afternoon, Detective Fountain helped execute a search warrant at the defendant's apartment and on Mr. Herman's car that had been towed to the MPD lot.

MPD Sergeant Katrina Henderson secured Mr. Herman's vehicle into the MPD lot and responded to the defendant's apartment to help in the search. In the defendant's bedroom, she found dice, a bottle filled with coins and assorted ammunition, and a box of thirty-six .357 Winchester bullets. On the kitchen table, she found cards and dice and a box of ten .40 caliber Winchester bullets. Each of the ammunition boxes was designed to hold 50 rounds. Sergeant Henderson collected swabs of what appeared to be blood on the ground near the apartments, DNA swabs from Mr. Herman, and swabs of a red substance on Mr. Herman's shoes.

Tennessee Bureau of Investigation ("TBI") crime laboratory supervisor Michael Turberville testified as an expert in forensic DNA analysis. The swabs taken from the wheel of the truck, the door frame of Mr. Bradley's apartment, and the breezeway of the apartment building contained traces of the victim's blood. A swab taken from the siding of the apartment building indicated the presence of human blood that was consistent with that of the victim, but the sample was "not sufficient to be conclusive." Agent Turberville also tested a pair of red sneakers that indicated the presence of human blood. The inside of the shoes contained the DNA "of at least five people," and because of the complexity of the mixture, he was unable to identify any DNA contributors.

TBI Agent Alex Brodhag testified as an expert in firearms examination. He determined that all but one of the bullet jacket fragments, the bullets, and all but one of the cartridge casings collected in this case were "fired through the barrel of the same .40 caliber weapon." He was unable to draw any conclusion as to one bullet jacket fragment and one cartridge casing. He acknowledged that the "rifling present on the bullets and bullet

-5-

jackets" were "common to a number of .40 caliber firearms." According to Agent Brodhag's report, the unfired cartridge found outside of the defendant's apartment door and all but one of the fired cartridge casings recovered in this case were .40 caliber Winchester brand cartridges. One cartridge was a different brand with a different type of casing from the others.

During cross-examination, Agent Brodhag acknowledged that there were several types of .40 caliber weapons through which the cartridges could have been fired but noted that "[i]t was a pretty short list." The only two brands of firearms that he knew to be a match to the cartridges were Smith & Wesson and Charter Arms, but he acknowledged that it was "entirely possible there is another manufacturer out there that uses the same type of rifling." He acknowledged that .40 caliber bullets were common.

MPD Detective Tyler Smith testified as an expert in digital forensics. He plotted the defendant's cellular telephone records, identifying the towers with which the telephone communicated and determining the telephone's location based upon its relationship to those towers. He acknowledged that plotting gave him only a general location but that from the data he could determine on "what side of the tower" the telephone was being used and "the date and the time" of a given call, text, or event. He determined that between 4:43 a.m. and 4:56 a.m. on March 18, the defendant's telephone was in the area of the Vie Apartments, noting that the Vie Apartments and the College Grove Apartments were very close together and that he could not determine a more specific location. The defendant's telephone was in Murfreesboro on March 18 from 4:00 a.m. to 1:00 p.m. A call was placed from the defendant's telephone while it was still in Murfreesboro to Michael McCory, the defendant's roommate, at 12:43 p.m. on March 18, which call lasted for just over eight minutes. The plotting showed that the telephone began moving toward Humboldt at 1:12 p.m. Detective Smith said that it was impossible for the defendant's telephone to have been in Humboldt at the time the eight-minute call was placed.

MPD Detective Jennifer West testified as an expert in digital forensics in the area of cellular telephone extractions and data recovery. She explained three types of telephone extractions: Logical extraction "is what you actually see on the device itself as you just pick up a phone and look through it," a file system extraction is more extensive and can reveal "some hidden information," and physical extraction, the most extensive of the three, extracts data from "the computer language itself" and can also reveal "deleted things." Certain operating systems also had databases through which she could recover deleted information. Detective West said that she cannot perform every extraction on all telephones because "it depends upon the version of software that the device might be running." In this case, Detective West analyzed the cellular telephones of the defendant, Mr. McCory, Christopher McLilly, and Mr. Herman.

-6-

Detective West said that she was not able to do a physical extraction on the defendant's telephone but used the telephone records to confirm her logical and file system extraction data. In the defendant's telephone, Mr. Bradley was identified by the nickname "Youngin," Quantavious Dance[3] was identified as "Camb0," James Donald was identified as "Dolph," Mr. McCory was identified as "Right Hand Man," Mr. McLilly was identified as "Mac," and Kristy McCurry was identified as "Kristy." From the extracted data, Detective West created a timeline of all of the defendant's texts, calls, photos, and "any other data reporting that the device might have done" within the given timeframe. She also discovered calls and texts that had been deleted from the telephone. The following calls, texts, and snapchats from March 18 were discovered in the defendant's cellular data:

| Time | Event | Content | Status |
|---|---|---|---|
| 12:32 a.m. | Text to Mr. Bradley | "He said he finna smkke yu cu[z] yp he finna smoke yu" | Deleted |
| 12:33 a.m. | Text from Mr. Bradley | "who gun he gt" | |
| 12:40 a.m. | Text to Mr. Bradley | "I think dolph." | Deleted |
| 12:48 a.m. | Text to Mr. Bradley | "He trying to call []u off my phone" | Deleted |
| 1:01 a.m. | 7-second call from Mr. Dance | | |
| 1:02 a.m. | 1-minute-and-19-second call from Mr. McCory | | |
| 1:08 a.m. | Text to Mr. Bradley | "He trying to call yu off my phone | Deleted |
| 1:17 a.m. | Text from Mr. Dance | "Yp got a strap?" | |
| 1:17 a.m. | Text to Mr. Dance | "No I'm trying to send him out. Now." | |
| 1:21 a.m. | Text from Mr. Dance | "Me and youngin bout to Com up ther make sure he not strap" | |
| 1:24 a.m. | Text to Mr. Dance | "He not but he ginna try to get Dolph strap" | |
| 1:25 a.m. | Text from Mr. Dance | "Tell Dolph dnt" | |
| 1:25 a.m. | Text to Mr. Dance | "Ok cu[z] | |
| 1:25 a.m. | Text to Mr. Dance | "He finna walk to Dolph car him ta n skee skee got the strap tho" | |

---

[3]      It appears from the record that Mr. Dance was also known as "Quan Campbell."

| | | | |
|---|---|---|---|
| 1:43 a.m. | Text from Mr. Dance | "Wer they goin" | |
| 1:45 a.m. | Text to Mr. Dance | "They not going now they sitting down now I'm trying to get him walk down stairs by his self" | |
| 1:45 a.m. | Text from Mr. Dance | "Unloc the door" | |
| 1:46 a.m. | Text to Mr. Dance | "Yp right there" | |
| 1:51 a.m. | Text to Mr. Bradley | "Answer the door rny homie skee coming he by his self" | Deleted |
| 1:51 a.m. | Text to Mr. Bradley | "Yp goi ng to t hi nk my n**** down stairs looking out so yp finna walk out in a min by his self" | Deleted |
| 1:53 a.m. | 53-second call from Mr. Bradley | | Deleted |
| 2:20 a.m. | Text to Mr. Bradley | "I'm on the way down cu[z]" | Deleted |
| 2:25 a.m. | Text to Mr. Bradley | "Open door" | Deleted |
| 3:16 a.m. | 1-minute-and-14-second call from Mr. Bradley | | |
| 4:22 a.m. | 22-second call from Mr. Bradley | | |
| 4:43 a.m. | 36-second call to Mr. Dance | | |
| 4:48 a.m. | 1-minute-and-17-second call from Mr. Dance | | |
| 4:51 a.m. | 33-second call from Mr. Dance | | |
| 4:54 a.m. | 11-second call from Mr. Dance | | |
| 4:55 a.m. | 38-second call to Mr. Dance | | |
| 4:56 a.m. | Text to Mr. Dance | "College grove right in front of your shit across.  Bushes" | |
| 4:59 a.m. | 48-second call to Mr. McCory | | |
| 5:05 a.m. | 16-second, 5-second, and 2-second calls to Mr. McLilly | | |

| Time | Event | Message | Status |
|---|---|---|---|
| 5:06 a.m. | Text from Mr. McLilly | "Who popped em.." | |
| 5:15 a.m. | 56-second call to Mr. Bradley | | |
| 5:39 a.m. | 25-second call from Mr. McCory | | |
| 5:39 a.m. | Text from Mr. McLilly | "Is that you?" | |
| 5:40 a.m. | Text to Mr. McLilly | "No don't open" | Deleted |
| 5:40 a.m. | 49-second call to Mr. McCory | | |
| 5:51 a.m. | 2-minute-and-24-second call from Mr. Bradley | | |
| 5:54 a.m. | Text from Mr. McCory | "Polics here" | |
| 5:55 a.m. | Text to Mr. McCory | "Ik bra youngin called yall ain't open did yy" | Deleted |
| 5:58 a.m. | 2-minute call to Mr. Bradley | | |
| 6:43 a.m. | Text from Mr. McLilly | "U was supposed to go to west TN I talked u bout 9:30 before I went to sleep." | Partially deleted |
| 6:46 a.m. | Text from Mr. McLilly | "You was chilling with 3 hoes when I was laying down. Get story straight Shaq was with his girl." | Partially deleted |
| 10:11 a.m. | 42-second call with Mr. Dance | | |
| 11:04 a.m. | Snapchat to Mr. McLilly | "Ok yall good" | Deleted |
| 11:14 a.m. | 1-minute-and-45-second call to Ms. McCurry | | |
| 11:17 a.m. | Snapchat to Mr. McLilly | "Yall straight" | Deleted |
| 11:49 a.m. | Text from Ms. McCurry | "I need to know wat I'm lying for I ain't got time to b in no shit cash" | |
| 11:49 a.m. | Text to Ms. McCurry | "Shawty ima let yu know" | |
| 11:50 a.m. | Text from Ms. McCurry | "We'll I better know before that call cums thru" | |

| Time | Event | Content |
|---|---|---|
| 11:51 a.m. | Text to Ms. McCurry | "Shawty they got shaq and chris under investigation sum shit happened at our crib last night ima let yu know I promise shawty." | |

During cross-examination, Detective West testified that she found the following text messages sent from Mr. Herman's telephone on March 18:

| Time | Event[4] | Content |
|---|---|---|
| 12:09 p.m. | Text to first unknown contact | "N****s juss hatin on me.  Tried to rob me and I wasn't goin..idc about no gun.  I work hard for my shit" |
| 12:10 p.m. | Text to second unknown contact | "I'm str8 famo n**** sittin in da county up here shit crazy Ima let yalln****sknow exactly what happene" |
| 12:11 p.m. | Text to third unknown contact | "Somebody tried to rob me and I wasn't goin.. Hatin on me.  I wouldn't give him my money n he shot me in my leg and ran" |
| 12:11 p.m. | Text to fourth unknown contact | "Bro I'm at the police station" |
| 12:19 p.m. | Text to fifth unknown contact | "Smh.. N****s be hatin.  Ardie got into it w this n**** and we had to beat him." |
| 12:24 p.m. | Text to fifth unknown contact | "I was at Ardie house in his room sleep. Ski and Shun was in their room.  Ardie was gone but left his front door open.  While I was sleep, dude walked in and stole somethin from Ardie.  When Ardie got bacc his door was locked and dud was in the" (ending cut off) |
| 12:42 p.m. | Snapchat from Mr. Herman | "Trynna rob everybody and they picked the wrong one cus Ima die behind mine I work too hard" |

The State recalled Mr. Herman.  He testified that the unlisted contacts to whom he sent the text messages were "[s]ome different females."  He acknowledged that he had not been robbed and that his texts were "[n]othing really.  Just some bullshit."  He

---

[4] None of the receiving telephone numbers were identified contacts in Mr. Herman's telephone.

said that he sent the text messages to "[l]et them know what happened that night." He acknowledged that he was untruthful in some of the texts and that he was not shot in the leg because he refused to give up his money during a robbery. He explained that he lied "[b]ecause I really didn't want [the contact] to know what was going on." He also said that he told the contacts that someone had tried to rob him "[b]ecause it just sound[ed] good." Mr. Herman said that the text sent at 12:19 p.m. was "about the altercation" and was truthful. He reiterated that his use of "we" in the text "[j]ust . . . meant that everybody who was in there who was against the victim." He said that nobody present during the altercation was "with the victim."

Demario Johnson testified that he was an acquaintance of Mr. Bradley's and that they sold and traded shoes with each other. He said that both men liked "any high end shoes, like exclusive shoes that's hard to get." He recalled that one day in 2016, Mr. Bradley and Mr. Broadnax came to his house and that Mr. Bradley had a "plastic Rubbermaid tote" with clothes and an "AR" long gun, also known as a "Chopper." A couple of days later, Mr. Bradley called Mr. Johnson and "asked me did I want to buy some shoes, did I want to check them out." Mr. Johnson agreed to buy a pair of "[r]ed Balenciagas" from Mr. Bradley for $200, which shoes Mr. Johnson estimated to retail for $1,000 to $1,500. He said that he did not know how Mr. Bradley had come into possession of the shoes.

Sergeant James Abbott, who worked as a detective with the MPD at the time of the shooting, was the lead investigator in this case. When he arrived at the Vie Apartments, he was briefed on the situation and "did a walk-through" of the scene. Officers found an unspent bullet outside of an upstairs apartment where the defendant lived with Mr. McCory, Mr. McLilly, and a female roommate. The defendant was not home when officers spoke with the other three occupants, all of whom agreed to go to the police station for questioning. Sergeant Abbott conducted several of the witness interviews.

Mr. McLilly told Sergeant Abbott that "he had laid down and gone to sleep sometime in the evening hours prior to midnight." Mr. McCory reported "that there had been some sort of disturbance during a dice game in the back room, which they identified was [the defendant's] room, in which a couple of what they described as dread heads had robbed a dice game around 12:00, 12:30 [a.m]." At the time of the interviews, officers had not yet identified the victim, but Mr. McCory and Mr. McLilly identified the victim from photographs as "Y.P." who "had been staying . . . some" at their apartment. At some point, officers received a call from the victim's stepfather and was able to identify the victim from that call. Sometime between 12:00 p.m. and 1:00 p.m., Mr. McCory spoke with the defendant over speaker phone at Sergeant Abbott's request. During that call, the defendant told the officers "that he was in Humboldt, Tennessee" and that he would return

to Murfreesboro the next morning. At some point that same day, Sergeant Abbot spoke with the defendant's uncle who told him that he would bring the defendant to the police station the next morning.

On March 19, the defendant came to the station for an interview. The defendant was released after his interview, and Sergeant Abbott took his cellular telephone into evidence. The jury viewed portions of the defendant's recorded interview, during which the defendant gave three written statements. In his first statement, he said that he was having "a kickback" at his apartment when, at approximately 4:30 a.m., "[Two] dread heads had an altercation with the dude YP." A man named "Saint," who Sergeant Abbott identified as Andre Woods, Jr., "grabbed [a] gun and him and the other dread head [r]obbed the dice game." Saint and the other man dragged the victim "to the door." The three men made it to the parking lot, and the defendant "heard gunshots," and saw "the victim laying on the ground." The defendant said a "dark Camaro fled from the scene."

From the defendant's cell records Sergeant Abbott determined that the defendant lied about his being in Humboldt during their telephone call the previous day and that the defendant had, in fact, been in Murfreesboro at that time. When confronted with this information, the defendant gave a second written statement, in which he said that "Saint and [a] friend" robbed the victim between 12:00 and 1:00 a.m. They "took it downstairs" to Mr. Bradley's apartment and "had an altercation." The victim took Mr. Bradley's marijuana, after which "Quan went down there." The defendant warned Mr. Dance and Mr. Bradley to not come back upstairs because the victim was there and had "Dolph['s] strap." Thirty minutes later, "the victim . . . was beat up by Youngin and his cousin for taking weed then he was pushed to the parking lot in between two cars where Youngin then pulled the trigger." After Mr. Bradley shot the victim, "everybody fle[]d the scene and ran after shots was fired."

Sergeant Abbott explained that "[a] strap is a pistol." One witness had shown Sergeant Abbott a snapchat video from the party, which video showed the defendant "with what they refer to as a chopper, which is an AR, a long gun, long rifle," and Mr. McCory "with a black and silver handgun." Although the defendant told Sergeant Abbott that Mr. Dance did not have a telephone, in searching the defendant's telephone, he discovered communication between the defendant and Mr. Dance. When confronted with this evidence, the defendant gave a third written statement, in which he said that he saw Mr. Bradley shoot the victim, "hit him in [the] head with [the] gun," shoot the victim a second time, and "hit him in the chest with [the] gun." The defendant ran and continuously "heard gun shots as I ran off the scene." The defendant also said that Mr. Bradley took the victim's red shoes "off his feet." Mr. Bradley was in possession of the "chopper," which had been taken to Mr. Bradley's apartment after the dice game "got hit." "Later [the victim] was beaten in Youngin['s] house then forced outside then shot and

-12-

dropped between two cars. [A]nd I kept hearing gunshots."

Sergeant Abbott also interviewed Mr. Herman and Mr. Bradley that day and interviewed Mr. Herman a second time on March 22, at which time, he collected Mr. Herman's DNA, cellular telephone, clothes, shoes, and a swab of blood on his shoes. Sergeant Abbott returned to the Vie Apartments on March 20, in an attempt to speak with Mr. Bradley and Mr. Broadnax when he saw "a brownish-reddish substance around the side of the door frame and on the siding next to the door" of Mr. Bradley's apartment. The next day, he recovered a shell casing from the scene but noted that it was "actually different from the other casings that were recovered around the body." Because the MPD "routinely had shots fired calls from the Vie" apartments and because "[t]here was quite a bit of . . . criminal activity at the Vie at the time," Sergeant Abbott did not believe that the casing was related to this case but submitted it to the TBI for analysis and testing.

Sergeant Abbott acknowledged that the investigation stalled, noting that several of the witnesses were from Humboldt, making it difficult to interview them and that officers "could not get straight answers as far as who all from Humboldt was there at the party." He said that many of the witnesses were uncooperative. Cellular telephone records indicated that some witnesses were telling others to delete photographs and Snapchat postings from the night of the party. The telephone records also revealed that, although Mr. Dance said that his cellular telephone had been stolen, he had continued to use his telephone.

During cross-examination, Sergeant Abbott said that the defendant's interview lasted approximately three hours. He acknowledged threatening the defendant with lengthy prison time during the interview but said that he did so in an attempt to get the defendant to tell the truth. He acknowledged that he did not make any arrests in this case until 18 months after the offenses. Sergeant Abbott explained what he believed occurred on March 18 based on his investigation:

> [T]here was an altercation involving the drugs that [the victim] had taken from Mr. Bradley due to believing that Mr. Bradley had set up him with the gentlemen they referred to as dread heads, the Saint individual.
>
> During this time period, Mr. Bradley and them and some others, including [the defendant], Mr. Herman, Mr. Broadnax, we believe James Donald . . . [and] Quan Campbell or Quantavious Dance was also in the apartment. During this time period, [the victim] was assaulted. At some point during the assault, his shoes were taken from him, then pushed

-13-

outside.  Once he was pushed outside, he was then shot and killed by [the defendant].

The State rested and, after a *Momon* colloquy, the defendant elected not to testify and did not put on any proof.

The jury convicted the defendant as charged.  The trial court merged the alternative convictions of first degree premeditated murder and first degree felony murder and imposed an effective sentence of life plus 20 years.

## *I.  Brady Material*

The defendant first argues that the State violated *Brady* requirements by failing to disclose a preferential agreement with Mr. Herman, alleging that Mr. Herman's release on his own recognizance from pretrial custody for charges related to the victim's death evinced an agreement between Mr. Herman and the State.  The State argues that no such agreement existed.

At the motion for new trial hearing, the defendant called Mr. Herman to testify.  Mr. Herman said that he initially declined to testify against the defendant.  Through counsel, he discussed with the State whether he would testify at the defendant's trial.  He acknowledged that he had pending charges, including first degree felony murder and aggravated robbery stemming from the victim's death.  Mr. Herman said that he did not know he would be released from custody until after the defendant's trial and that he was "[k]ind of" surprised that he was released on his own recognizance.  Mr. Herman could not remember specifics but said that he was released either the day his testimony concluded or the following day.  He denied that he received any offers from the State in exchange for his testimony.

During cross-examination, Mr. Herman reiterated that he had not received any offers from or made any agreement with the State regarding his testimony and that he did not know that he would be released from pretrial custody.

Ben Wetsell, who represented Mr. Herman on his pending charges, testified that the State did not offer any preferential treatment to Mr. Herman in exchange for his testimony.  Mr. Wetsell said that he learned that the State had agreed to Mr. Herman's pretrial release shortly after the defendant's trial concluded, and the State presented him with a proposed order.  Mr. Wetsell said that he had told the State, "I expected the case [against Mr. Herman] to be dismissed if Mr. Herman decided to testify."  The State, however, did not tell Mr. Wetsell anything "at that point, whether [dismissal] could be done or if something else could be done."  Mr. Wetsell emphasized that he had simply "made a

statement" of what he wanted for his client but that "it wasn't any kind of agreement" with the State.

The constitutional right to a fair trial imposes upon the State "duties consistent with the[] sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." *Cone v. Bell*, 556 U.S. 449, 451 (2009) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976) (citation and internal quotation marks omitted)). In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (appendix); *Johnson*, 38 S.W.3d at 56.

To prove a *Brady* violation, a defendant must demonstrate:

(1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not),

(2) that the State suppressed the information,

(3) that the information was favorable to the defendant, and

(4) that the information was material.

*Johnson*, 38 S.W.3d at 56 (citing *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995); *Walker*, 910 S.W.2d at 389).

Here, the defendant has failed to demonstrate that the State had any agreement with Mr. Herman for pretrial release or any other form of leniency in his pending charges in exchange for his testimony against the defendant. The fact that Mr. Herman was granted pretrial release following the defendant's trial does not necessarily indicate that the State had agreed to the arrangement in exchange for Mr. Herman's testimony. Because the State's obligation to disclose favorable evidence under *Brady* does not extend to nonexistent evidence, this issue lacks merit.

-15-

## II. Pretrial Statements

Next, the defendant argues that the trial court erred by failing to strike Mr. Herman's testimony on the ground that the State failed to produce Mr. Herman's pretrial statements pursuant to Code section 40-17-120 and Criminal Procedure Rule 26.2. The State contends that all of Mr. Herman's pretrial statements were provided in discovery materials.

Tennessee Rule of Criminal Procedure 26.2 provides:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.
>
> . . . .
>
> . . . . If the party who called the witness disobeys an order to deliver a statement, the court shall strike the witness's testimony from the record and order the trial to proceed. If the attorney for the state disobeys the order, the court shall declare a mistrial if required in the interest of justice.

Tenn. R. Crim. P. 26.2(a), (d); *see also* T.C.A. § 40-17-120(a). In this context, "'statement' means . . . [a] written statement that the witness makes and signs, or otherwise adopts or approves; or . . . [a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f); *see also* T.C.A. § 40-17-120(b).

Here, the defendant moved pretrial for early production of witness statements. The record does not contain an order on the motion, but at the motion for new trial hearing, the trial court found that "all statements made prior to the trial had been presented" to the defendant by the State. The defendant concedes that he received a copy of Mr. Herman's recorded interview with the police and has identified no other statement that the State should have provided under the rule. The fact that Mr. Herman's trial testimony differed from his police interviews does not evince the existence of an

-16-

additional statement as defined by the rule. Likewise, the fact that Mr. Herman testified that he no longer lived in Chattanooga because he was fearful for his safety does not indicate that the State withheld beneficial information as the defendant argues. The defendant is not entitled to relief on this issue.

### III. Sufficiency of the Evidence

The defendant contends that the State failed to present sufficient evidence to sustain the convictions and to corroborate Mr. Herman's accomplice testimony. The State disagrees.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964) *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the

commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the trier of fact. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts*, 379 S.W.2d at 43).

As relevant to this case, "[e]specially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and [w]here the victim suffers serious bodily injury. T.C.A. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

"First degree murder is . . . [a] premeditated and intentional killing of another; . . . [or a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy . . . ." *Id.* § 39-13-202(a)(1)-(2) (2014). In this context, "'[p]remeditation' means that the intent to kill must have been formed prior to the act itself." *Id.* § 39-13-202(e).

Here, the evidence adduced at trial, taken in the light most favorable to the State, established that in the early morning hours of March 18, 2016, the defendant hosted a party in his upstairs apartment at the Vie Apartments in Murfreesboro. The party included a gambling game of dice, during which the victim was robbed by two men. The victim, believing that Mr. Bradley had set him up to be robbed, went to Mr. Bradley's downstairs apartment, took a bag of marijuana from Mr. Bradley's room, and hid it outside. The victim

-18-

and Mr. Bradley argued, and Mr. Bradley, believing the victim had stolen his marijuana, called the defendant to come downstairs to prevent the victim from leaving until the marijuana was found. The defendant, armed with a gun, threatened to beat up and shoot the victim. After Mr. Bradley found the marijuana, the defendant assaulted the victim, forcing him into a corner and beating him. The defendant pointed his gun at the victim and ordered him to remove his shoes, which shoes Mr. Bradley later sold for $200. The defendant forced the victim outside at gunpoint, and when the victim attempted to run, the defendant shot him at least eight times, continuing to shoot him after he fell to the ground. The victim died as a result of his injuries, suffering bullet wounds to multiple vital organs and a head injury from blunt force trauma. The defendant coordinated an alibi with Mr. McLilly and asked Ms. McCurry to lie for him after the shooting.

This evidence is more than sufficient to establish that the defendant robbed the victim of his shoes at gunpoint and caused the victim to suffer serious bodily injury. The evidence also sufficiently establishes that the defendant shot and killed the victim in perpetration of the robbery and with premeditation. The defendant came to Mr. Bradley's apartment armed with a gun in order to detain the unarmed victim while Mr. Bradley looked for his missing marijuana. The defendant beat the victim and threatened to shoot the victim multiple times. He gunned the victim down in the parking lot as the victim tried to run away and deleted several texts messages and calls from his cellular telephone related to the events of the evening before the police took the telephone into evidence. *See State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (circumstances supporting a finding of premeditation include "the use of a deadly weapon upon an unarmed victim; . . . the accused's declarations of an intent to kill; . . . the particular cruelty of the killing; the accused's procurement of a weapon prior to the killing; . . . [and] destruction or secretion of evidence of the killing") (citations omitted).

From the record it appears that the trial court neither found Mr. Herman to be an accomplice as a matter of law nor instructed the jury to make a factual determination on the issue. We also note that the defendant did not object to the trial court's instructions or request that the charge include an instruction on accomplice testimony, and consequently, this issue is waived on appeal. *See State v. Anderson*, 985 S.W.2d 9, 18 (Tenn. Crim. App. 1997) ("Upon the trial court's failure to instruct the jury on the issue of accomplice testimony, it became the defendant's responsibility to submit a special request. The failure to do so resulted in a waiver of the issue." (citations omitted)). Waiver notwithstanding, we conclude that any error in this matter was harmless because the evidence sufficiently corroborated Mr. Herman's testimony. In the defendant's own statements, he acknowledged that he was present at the time of the shooting. A Snapchat video taken at the party showed the defendant holding a gun, and officers recovered numerous rounds of .40 caliber Winchester ammunition from the defendant's apartment and one unfired .40 caliber Winchester cartridge from outside the door of the apartment,

the same caliber and brand as the bullets used to kill the victim. Additionally, the defendant's cellular telephone data showed that he partially deleted two text messages from Mr. McLilly sent less than two hours after the shooting, which messages appeared to be an attempt to create an alibi for the defendant. The defendant also received two messages from Ms. McCurry indicating that the defendant had asked her to lie for him.

## IV. Double Jeopardy

Finally, the defendant argues that the trial court violated the principles of double jeopardy by failing to merge his convictions of first degree premeditated murder and first degree felony murder.

We need not tarry long with this issue because, as the State points out, the trial court properly merged the convictions. After the jury rendered its verdict, the trial court orally pronounced that the first degree murder convictions, Counts 2 and 3 of the indictment, "should be merged," and the judgment forms properly reflect the merger. As such, the defendant was not subject to double jeopardy by the two convictions of first degree murder. *See State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997) (merger of guilty verdicts of premeditated murder and felony murder that related to the same homicide "protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed 'charges' or 'convictions'").

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE